Submitted November 4, 2014, reversed and remanded December 9, 2015

In the Matter of R. E. G.,
Alleged to be a Person with Intellectual Disabilities.

STATE OF OREGON,
*Respondent,*

*v.*

R. E. G.,
*Appellant.*

Polk County Circuit Court
M3318; A151899

364 P3d 733

James A. Palmer filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Carolyn Alexander, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

SERCOMBE, P. J.

## SERCOMBE, P. J.

Appellant appeals an order committing him to the custody of the Department of Human Services (DHS) as a person with an intellectual disability, which caused him to be dangerous to others and unable to provide for his basic personal needs as necessary for his health, safety, and habilitation. ORS 427.215.[1] Appellant contends that the state failed to conduct an adequate diagnostic evaluation of him during the precommitment investigation. Because of that, appellant claims that the trial court erred in issuing a trial citation without the necessary prerequisites and in committing him without an adequate record. We agree with appellant and, accordingly, reverse and remand the order of commitment.

## THE COMMITMENT PROCESS

A brief description of the intellectual disability commitment process provides the necessary context for our evaluation of appellant's claims. Under ORS 427.235(1), if two persons file a sworn notice with the circuit court setting forth "the facts sufficient to show the need for investigation" that a person "has an intellectual disability and is in need of commitment for residential care, treatment and training," the court must then "forward notice to the community development disabilities program director in the county," who then "shall immediately investigate to determine whether the person has an intellectual disability and

---

[1] At the time of appellant's commitment in 2012, ORS 427.215 provided:

"For the purposes of ORS 427.061 and 427.235 to 427.290, a person with an intellectual disability is in need of commitment for residential care, treatment and training if the person is either:

"(1) Dangerous to self or others; or

"(2) Unable to provide for the person's basic personal needs and not receiving care as is necessary for the health, safety or habilitation of the person."

Under ORS 427.005(10), an "intellectual disability" is "synonymous with mental retardation" and means, *inter alia,* "significant subaverage general intellectual functioning, defined as intelligence quotients under 70 as measured by a qualified professional and existing concurrently with significant impairment in adaptive behavior" that is "directly related to the intellectual disability."

The legislature amended various parts of ORS 427.005 to 427.400 in 2013. *See* Or Laws 2013, ch 36, §§ 3 - 15. We refer in this opinion to the 2012 statutes in effect at the time of the commitment trial.

is in need of commitment." ORS 427.235(3), whose meaning is the core of the present dispute, specifies the nature of that investigation:

> "Any investigation conducted by the community developmental disabilities program director or the designee of the director under subsection (1) of this section shall commence with an interview or examination of the person alleged to have an intellectual disability, where possible, in the home of the person or other place familiar to the person. Further investigation if warranted shall include a diagnostic evaluation as defined in ORS 427.105 and may also include interviews with the person's relatives, neighbors, teachers and physician. The investigation shall also determine if any alternatives to commitment are available. The investigator shall also determine and recommend to the court whether the person is incapacitated and in need of a guardian or conservator."[2]

The investigation report "shall be submitted to the court" and a "copy of the investigation report and diagnostic evaluation, if any, shall also be made available to * * * the person alleged to have an intellectual disability * * * as soon as possible after its completion but in any case prior to a [commitment] hearing." ORS 427.235(4).

Under ORS 427.245(1), following receipt of the investigation report, if the court concludes that there is probable cause to believe that the subject of the investigation has an intellectual disability and a need for commitment for residential care, treatment, and training, the court issues a citation requiring the alleged intellectually disabled person to appear at a hearing. ORS 427.245(2) elaborates on the procedural significance of that citation:

> "Upon a determination under subsection (1) of this section that probable cause exists to believe that the person has an intellectual disability and is in need of commitment for residential care, treatment and training, the court shall cause a citation to issue to the person or, if the person is a

---

[2] ORS 427.105 defines the diagnostic evaluation as including a social history, a "psychological evaluation, including an appropriate individual test of intellectual capacity, an academic achievement test, a social development assessment and an adaptive behavior assessment[,]" a medical evaluation, and speech, hearing, and dental screenings.

minor or incapacitated, to the parent or legal guardian of the person. The citation shall state the specific reasons the person is believed to be in need of commitment for residential care, treatment and training. The citation shall also contain a notice of the time and place of the commitment hearing, the right to legal counsel, the right to have legal counsel appointed if the person is unable to afford legal counsel, the right to have legal counsel appointed immediately if so requested, the right to subpoena witnesses in behalf of the person to testify at the hearing, the right to cross-examine all witnesses and such other information as the court may direct. * * * The community development disabilities program director or the designee of the director shall advise the person of the purpose of the citation and the possible consequences of the proceeding."

Under ORS 427.265, when the person alleged to be intellectually disabled is brought before the court, the court must advise that person of the nature of the proceedings and of that person's rights to counsel and to subpoena witnesses.

ORS 427.270(1) provides that the "examining facility conducting the diagnostic evaluation shall make its report in writing to the court." If the report shows an intellectual disability and the need of commitment for care, treatment, and training, the report "shall include a recommendation as to the type of treatment or training facility most suitable for the person" and whether the person would cooperate with and benefit from voluntary treatment or training. *Id.* ORS 427.285 sets out that

"[t]he investigator and other appropriate persons or professionals as necessary shall appear at the hearing and present the evidence. The person alleged to have an intellectual disability and to be in need of commitment for residential care, treatment and training shall have the right to cross-examine all witnesses, the investigator and the representative."

Following the hearing, if, "in the opinion of the court the person has, by clear and convincing evidence, an intellectual disability and is in need of commitment for residential care, treatment and training" (the "commitment determinations"), the court may order voluntary treatment or an involuntary commitment for a period not to exceed one year. ORS 427.290. As noted, the commitment determinations

involve (1) a medical determination of intellectual disability (both intellectual functioning and adaptive behavior) "as measured by a qualified professional," ORS 427.005(10)(a); (2) a determination of the need for commitment for residential care, treatment, and training, with the need established by findings of a danger to self or others, or an inability to provide for basic personal needs, ORS 427.215; and (3) a determination of the particulars of the appropriate care, treatment, and training established by the diagnostic evaluation, ORS 427.270, and other evidence in the hearing.

## HISTORY OF THE CASE

With that context, we turn to the salient facts of the case, which are undisputed. Appellant, a 25-year-old man with limited mental functioning, had two altercations with police officers in 2011. In the first altercation, appellant bit a Dallas police officer on the arm when the officer was rendering assistance to appellant during an apparent mental health crisis. Criminal charges were filed against appellant as a result of that incident. In the second altercation, appellant assaulted a Salem police officer and then was detained and subdued by four other police officers.

In the criminal proceeding, appellant's attorney requested an evaluation to determine whether appellant was fit to proceed. *See* ORS 161.360 (setting out standards for determining whether a person is fit to proceed in a criminal case). The evaluator, Gordon, reviewed appellant's developmental, social, educational, employment, and medical histories, and performed a mental status examination. Gordon also reviewed past mental health evaluations of appellant and administered a test to measure appellant's intelligence. Gordon diagnosed appellant with "moderate mental retardation"; concluded that, because of appellant's intellectual disability, appellant was not able to understand the nature of the proceedings, assist and cooperate with his counsel, or participate in his defense; and determined that appellant was not, and never would be, fit to proceed.

At the direction of the trial court, Smith, a psychologist at Oregon State Hospital, performed a second evaluation to assess appellant's fitness to proceed. Smith reviewed appellant's mental health records and Gordon's evaluation

and conducted a psychosocial interview and mental status examination of appellant. Smith also diagnosed appellant with "moderate mental retardation" and concurred in Gordon's conclusion that appellant would never be fit to proceed.

Following those evaluations, Wall, the prosecutor in the criminal case, was concerned that appellant "was going to be discharged without prejudice" and would therefore "be again at large in the community and possibly dangerous to more police officers." For that reason, Wall and Breitwieser, a state-certified mental health investigator, filed an ORS 427.235(2) notice in the circuit court alleging that appellant should be committed because he was a person with an intellectual disability and a danger to himself or others. Breitwieser was subsequently designated by the director of the county community developmental disabilities program to conduct an investigation to determine whether appellant had an intellectual disability and was in need of commitment for residential care, treatment, and training.

In the course of his investigation, Breitwieser interviewed appellant, his mother, and his counselor. Breitwieser also reviewed the police reports of the Dallas and Salem incidents, and the fitness evaluations prepared by Gordon and Smith. Breitwieser did not, however, obtain a complete diagnostic evaluation of appellant under ORS 427.105, relying instead on the fitness evaluations by Gordon and Smith. Breitwieser submitted an investigation report to the court, in which he concluded that appellant was an intellectually disabled person in need of commitment for residential care, treatment, and training. On the basis of that report, the court found probable cause that appellant was intellectually disabled and in need of commitment and issued a citation under ORS 427.245(1) requiring appellant to appear for a hearing to determine if he should be committed.

At the commitment hearing, appellant challenged the adequacy of Breitwieser's investigation. He asserted that the investigation was inadequate because the state did not conduct a diagnostic evaluation of appellant in compliance with ORS 427.105 and ORS 427.270(1). The trial court agreed that the investigation did not comply with those

statutory requirements but, nevertheless, determined that clear and convincing evidence supported the need to commit appellant. After determining that appellant was intellectually disabled, and that, because of that disability, he was a danger to others and unable to provide for his basic needs, and that appellant would not benefit from voluntary treatment or conditional release, the court ordered appellant committed to the custody of DHS.

On appeal, appellant renews his argument that the state did not conduct an adequate investigation under ORS 427.235(3). Appellant claims that the investigation was inadequate because it did not include a diagnostic evaluation meeting the requirements of ORS 427.105. Appellant contends that a complete investigation report under ORS 427.235(3) is a necessary predicate to both the issuance of a citation to appear under ORS 427.245 and the creation of a record under ORS 427.270 to support the court's ultimate commitment determinations under ORS 427.290. Appellant asserts that the provision of a diagnostic evaluation is an essential procedural safeguard in the civil commitment process and that its omission prejudices his procedural rights under the commitment statutes.

The state responds that ORS 427.235(3) does not require a diagnostic evaluation as part of the investigation. The state further asserts that, to the extent any diagnostic evaluation is required, the fitness evaluations are a sufficient substitute for a diagnostic evaluation. Accordingly, the state asserts that the commitment order was supported by a legally sufficient record and entered in compliance with the statutory procedures.

## NECESSITY OF A DIAGNOSTIC EVALUATION

We conclude that ORS 427.235(3) requires a diagnostic evaluation that meets the particulars of ORS 427.105 as part of the state's investigation of the need for commitment. As noted, ORS 427.235(1) provides that, once notice is filed, the community development disabilities program director, or the director's designee, "shall immediately investigate to determine whether the person has an intellectual disability and is in need of commitment for residential care, treatment and training." ORS 427.235(3) then provides:

"Any investigation conducted by the community developmental disabilities program director or the designee of the director under subsection (1) of this section shall commence with an interview or examination of the person alleged to have an intellectual disability, where possible, in the home of the person or other place familiar to the person. Further investigation *if warranted shall include a diagnostic evaluation* as defined in ORS 427.105 and may also include interviews with the person's relatives, neighbors, teachers and physician. The investigation shall also determine if any alternatives to commitment are available. The investigator shall also determine and recommend to the court whether the person is incapacitated and in need of a guardian or conservator."

(Emphasis added.)

· The state argues that, by use of the term "if warranted," the legislature intended to permit the investigator to finish the investigation without a diagnostic evaluation, and recommend to the court that the intellectually disabled person be committed, if the investigator believes that no further investigation beyond an interview or examination is necessary. In support of that view, the state points to ORS 427.235(4), which provides that "[a] copy of the investigation report and diagnostic evaluation, *if any*, shall also be made available to the Developmental Disability Diagnosis and Evaluation Service and to the person alleged to have an intellectual disability." (Emphasis added.) Appellant, on the other hand, argues that a diagnostic evaluation is always "warranted" under ORS 427.235(3) when, as here, the investigation makes medical determinations and recommends commitment, and is only not "warranted" if the interview or examination supports an end to the investigation and a determination that commitment is not needed.

We evaluate the meaning of the statute using the familiar statutory construction framework established in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009), and *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). First, we examine the text and context of the statute. *PGE*, 317 Or at 610-11. A statute's context includes "other provisions of the same statute and other related statutes." *Id.* at 611. We also consider relevant legislative history,

assigning it such weight as we deem appropriate. *Gaines,* 346 Or at 170-72.

The text of ORS 427.235(3) plainly states that a diagnostic evaluation is required whenever further investigation, beyond an interview or examination of the alleged person with intellectual disabilities, is "warranted." The ordinary meaning of "warrant" is "to serve as or give sufficient ground or reason for: require or permit as a consequence : JUSTIFY[.]" *Webster's Third New Int'l Dictionary* 2577-78 (unabridged ed 2002). Thus, a further investigation is "warranted" if a diagnostic evaluation is required to make subsequent determinations in the commitment process.

Under the statutory process outlined earlier, a diagnostic evaluation is a necessary predicate to several steps in the commitment process. Under ORS 427.105, a diagnostic evaluation contains the needed medical and psychological evaluation to determine the existence of an intellectual disability and a determination of "the most appropriate services for treatment and training of the person."[3] Thus, the investigation report and diagnostic evaluation of the alleged intellectually disabled person function to provide: (1) documentation of the determinations by the community development

---

[3] ORS 427.105 provides:

"(1) Pursuant to rules of the Department of Human Services, a diagnostic evaluation shall include, but not be limited to, the following:

"(a) A social history;

"(b) A psychological evaluation, including an appropriate individual test of intellectual capacity, an academic achievement test, a social development assessment and an adaptive behavior assessment;

"(c) A medical evaluation including prenatal, natal, early postnatal and other past and family history, a complete physical examination including tests of visual function, and any specialized examinations necessary;

"(d) A speech and hearing screening; and

"(e) A dental screening.

"(2) The diagnostic evaluation shall also attempt to determine the existence of related conditions such as epilepsy, cerebral palsy, autism and specific learning disorders and to outline the most appropriate services for the treatment and training of the person, whether those services are immediately available or not.

"(3) A facility approved by the department to conduct diagnostic evaluations may contract with qualified persons to perform components of the evaluation."

disabilities director or the director's designee under ORS 427.235(1) and the examining facility under ORS 427.270 as to intellectual disability and need for commitment; (2) the evidence necessary for a probable cause determination by the court of the intellectual disability and need for commitment under ORS 427.245 as a prerequisite for issuance of the citation to appear; (3) the basis for the listing in the citation of "the specific reasons the person is believed to be in need of commitment" as required by ORS 427.245(2); (4) the content of the "report in writing to the court" required to be admitted into evidence at the hearing under ORS 427.270; (5) part of the "evidence" that must be presented at the hearing by the "investigator and other appropriate persons or professionals" under ORS 427.285 and that is subject to cross-examination by the alleged intellectually disabled person; and (6) some of the "evidence" and "the findings of the investigation and other examiners" that are the required bases for the court's ultimate commitment determinations under ORS 427.290. In light of that context, we easily conclude that further investigation, including a diagnostic evaluation, is "warranted" and, therefore, required, whenever a court commences a commitment process by issuance of a citation under ORS 427.245 and proceeds to commit an alleged intellectually disabled person under ORS 427.290.

The state's contextual argument—that ORS 427.235(4) suggests that a diagnostic evaluation is optional—is unpersuasive. ORS 427.235(4) states that "[a] copy of the investigation report and diagnostic evaluation, *if any*, shall also be made available to the Developmental Disability Diagnosis and Evaluation Service and to the person alleged to have an intellectual disability." (Emphasis added.) However, consistent with our construction of ORS 427.235(3), the phrase "if any" means only that the investigator is not required to make a diagnostic evaluation available if the investigator has found the ORS 427.235(1) notice of need for commitment to be without merit and declined to pursue a further investigation.

The legislative history of ORS 427.235(3) supports our construction of the statute. Prior to 1979, intellectual disability civil commitments under ORS chapter 427 did not

include a precommitment investigation as robust as that set out in ORS 427.235. Instead, before a person alleged to be "mentally deficient" was committed, all that had to occur was a precommitment examination. *See former* ORS 427.025(1) (1977), *repealed by* Or Laws 1979, ch 683, § 37 ("If, after receiving a petition for commitment and viewing the person alleged to be mentally deficient, the judge considers the person to be in need of care, custody or training, he shall order a precommitment physical and mental examination of the person at a facility or institution as provided in subsection (2) of this section. No person shall be committed to the Mental Health Division as a mentally deficient person without a precommitment examination.").

In 1979, the legislature largely repealed and replaced chapter 427 and created new procedures, including the investigation procedures under ORS 427.235, discussed above.[4] The subsection at issue in this case, ORS 427.235(3), originated as section 17, subsection 3, of Senate Bill (SB) 142 (1979). That subsection of the bill did not include the phrase "if warranted" when introduced in the Senate Committee on Health and Welfare. *See* SB 142, § 17(3) ("Any investigation * * * shall include an interview or examination of the allegedly mentally retarded person, where possible, in his home or other place familiar to him. The investigation shall include a diagnostic evaluation as defined in [ORS 427.105]."). At a committee hearing on February 7, 1979, Senator Roberts raised concerns that the civil commitment process could be used as a tool of harassment, allowing for a significant invasion of privacy without much evidence that commitment was necessary. *See* Tape Recording, Senate Committee on Health and Welfare, SB 142, Feb 7, 1979,

---

[4] In addition to changing the investigation process, the legislature also updated several other important features of chapter 427. Notably, the legislature specified that a person required commitment only if that person is dangerous to himself or herself or others or is unable to provide for his or her basic needs. Or Laws 1979, ch 683, § 16. The legislature also provided for several new procedural protections during the commitment hearing. *See, e.g.,* Or Laws 1979, ch 683, § 18(1) (mandating that the court conduct a commitment hearing only upon a finding of "probable cause" that a person is in need of commitment); Or Laws 1979, ch 683, § 20 (stating that the court must notify the person of his or her rights at the start of the hearing); Or Laws 1979, ch 683, § 23 (establishing the allegedly intellectually disabled person's right to cross-examine witnesses during the hearing).

Tape 6, Side A (statement of Sen Frank Roberts) ("There's not even any requirement that there be a statement here on the basis of which the judge might think there was some presumptive evidence [that commitment was necessary]. * * * [I]ndividuals [who are the subject of an investigation] may feel really paranoid and harassed just by having somebody come in and insist that they can conduct an examination of them.").

The Mental Health Division, in conjunction with the Oregon Association for Retarded Citizens, responded to the senator's concerns by developing amendments to SB 142, including the addition of the phrase "if warranted" to what would become ORS 427.235(3). The phrase "if warranted" was meant to give the "professional conducting an investigation * * * more latitude to determine the need to continue. If, during the initial interview, it is clear to the examiner that there is no mental retardation, further invasion of the person's privacy would be terminated." Tape Recording, Senate Committee on Health and Welfare, SB 142, Mar 7, 1979, Tape 11, Side B (statement of David A. Isom, Assistant Administrator, Programs for Mental Retardation and Other Developmental Disabilities, Mental Health Division, Department of Human Resources); *see also* Tape Recording, Senate Committee on Health and Welfare, SB 142, Mar 7, 1979, Tape 11, Side B (statement of James Taves, Oregon Association for Retarded Citizens) ("The proposed amendments * * * will also allow the investigation to stop short of a comprehensive evaluation if early indications demonstrate the person is not in need of commitment. This * * * will reduce any potential for harassment.").

Thus, considering the statutory text, context, and legislative history, we conclude that the phrase "if warranted" reflects the legislature's intent that an investigator be permitted to end an investigation under ORS 427.235 if he or she concludes, after the initial interview, that there is no substance to the allegation that a person is intellectually disabled and in need of commitment. However, if the interview indicates that the person might be intellectually disabled and in need of commitment, then a further investigation would be warranted, and a diagnostic evaluation must be performed. The statute does not contemplate that a

person may be committed if the precommitment investigation does not include a diagnostic evaluation.

Thus, the court erred if it committed appellant without the necessary diagnostic evaluation. The remaining question, then, is whether the fitness evaluations conducted by Gordon and Smith that were included in the investigation report were sufficient to comply with the requirements for a diagnostic evaluation set out in ORS 427.105.

## SUFFICIENCY OF GORDON AND SMITH EVALUATIONS

The state contends that the Gordon and Smith fitness evaluations were a sufficient substitute for the diagnostic evaluation required by ORS 427.235(3). The state relies on ORS 427.270(1), which provides that,

"[w]here components of the diagnostic evaluation have been performed within the previous year according to Department of Human Services rules and ORS 427.105, and the records of the evaluation are available * * *, the results of such evaluation may be introduced in court in lieu of repetition of those components by the examining facility."

The state argues that the portions of the fitness evaluations in which the evaluators reviewed appellant's social, mental health, and educational histories, and administered tests to measure his intellectual capacity, satisfied the requirements of the DHS rules and ORS 427.105. According to the state, the fitness evaluations were adequate for the trial court to determine whether appellant needed to be committed because the state conducted a sufficient psychological evaluation under ORS 427.105(2)(b). Therefore, the state asserts, no additional diagnostic evaluation was required. We conclude that the fitness evaluations did not comply with the DHS rules and ORS 427.105 and that they also failed to satisfy additional requirements imposed by ORS 427.270(1).

As noted, ORS 427.105 provides that a diagnostic evaluation is subject to the "rules of the Department of Human Services" and that it include a number of components, among them a "psychological evaluation, including an appropriate individual test of intellectual capacity, an academic

achievement test, a social development assessment and an adaptive behavior assessment," a "medical evaluation including prenatal, natal, early postnatal and other past and family history, a complete physical examination including tests of visual function, and any specialized examinations necessary," and a determination of "the most appropriate services for the treatment and training of the person, whether those services are immediately available or not."

The DHS rules for diagnostic evaluations include additional guidance. The rules provide that a diagnostic evaluation "shall be done by an interdisciplinary team" including a psychologist, a physician, and a social worker. *Former* OAR 309-042-0050(3)(f), (4)(a) (May 5, 1980).[5] Further, the rules set out specific standards for the evaluation as conducted by each of those professionals, *former* OAR 309-042-0050(5)(a), (6), (7)(a) (May 5, 1980), and require that each professional independently evaluate the alleged intellectually disabled person according to standards prescribed in the rule and then collectively prepare a report that "summarizes the client's diagnoses, problems, and the interdisciplinary team's recommendation[.]" *Former* OAR 309-042-0050(4)(a) (May 5, 1980).

ORS 427.270(1) imposes additional requirements for the examining facility's report of the diagnostic evaluation beyond those provided in ORS 427.105. ORS 427.270(1) provides:

"If the facility finds, and shows by its report, that the person examined has an intellectual disability and is in need of commitment for residential care, treatment and training, the report shall include a recommendation as to the type of treatment or training facility most suitable for the person. The report shall also advise the court whether in the opinion of the examining facility the person and, if the person is a minor or incapacitated, the parents or legal guardian of the person would cooperate with voluntary treatment or training and whether the person would benefit either from voluntary treatment or training or from appointment of a legal guardian or conservator."

---

[5] The DHS rules in effect at the time of appellant's commitment hearing were repealed in 2014. The citations to the Oregon Administrative Rules in this opinion refer to the rules in effect at the time of the hearing.

When reviewed against the standards set forth above, the fitness evaluations come up short in both form and substance. To begin with, a diagnostic evaluation must be performed by a "facility" or a person under contract with a "facility." *See* ORS 427.105(3) ("A facility approved by the department to conduct diagnostic evaluations may contract with qualified persons to perform components of the evaluation."); ORS 427.270(1) (identifying the entity that must prepare and forward a written report of a diagnostic evaluation as the "examining facility").[6] The record does not show that Gordon or Smith were associated or under contract with a "facility."

Furthermore, a diagnostic evaluation must be conducted by an interdisciplinary team consisting of a psychologist, a physician, and a social worker. *Former* OAR 309-042-0050(3)(f), (4)(a) (May 5, 1980). Each member of that team is directed to conduct an independent evaluation of the intellectually disabled person. *Id.* Here, there was no "interdisciplinary team," and only psychologists participated in the evaluations.

The rules further require that the interdisciplinary team produce a collective diagnostic evaluation. The report must summarize the alleged intellectually disabled person's "diagnoses, problems, and the interdisciplinary team's recommendation[,]" *former* OAR 309-042-0050(4)(a) (May 5, 1980), and evaluate the alleged intellectually disabled person's social and medical—as well as his or her psychological—needs as a basis for recommending a course of action for the court to take. *See* ORS 427.105 (a diagnostic evaluation must include a social history, a psychological evaluation, and a medical evaluation). Thus, the fitness evaluations are substantially different in form from the diagnostic evaluation.

The fitness evaluations were also substantively deficient because they did not purport to evaluate whether

---

[6] The term "facility" is defined by statute in chapter 427. A "facility" is "a state training center, community hospital, group home, activity center, intermediate care facility, community mental health clinic, or such other facility or program as the Department of Human Services approves to provide necessary services to persons with intellectual disabilities or other developmental disabilities." ORS 427.005(6).

appellant was "in need of commitment for residential care, treatment and training" as required by ORS 427.270(1). They also did not address the "type of treatment or training facility most suitable for" appellant or whether appellant would benefit from "voluntary treatment or training" or the "appointment of a legal guardian or conservator." *Id.*; *see also* ORS 427.105(2) (the diagnostic evaluation shall "outline the most appropriate services for the treatment and training of the person whether those services are immediately available or not").

Thus, when the court decided to commit appellant, there was no statutorily sufficient diagnostic evaluation in the record. Accordingly, the state failed to comply with the statutory procedures and produce the evidence necessary to justify a commitment under ORS chapter 427.

## CONCLUSION

Civil commitment is, by its nature, a "massive curtailment of liberty," and the procedures provided in ORS chapter 427 are intended to assure that an intellectually disabled person gets the "benefit of a full and fair hearing before that person is committed." *Cf. State v. Allison*, 129 Or App 47, 49-50, 877 P2d 660 (1994) (discussing the procedural protections in the context of mental illness civil commitment proceedings (internal quotation marks omitted)). ORS 427.245 requires a diagnostic evaluation as a predicate to a determination of probable cause and issuance of a citation to the alleged mentally disabled person to appear at a commitment hearing. That procedural safeguard protects against further invasions of an affected person's privacy interests by the holding of a commitment hearing.

Moreover, the failure to provide a diagnostic evaluation prejudiced appellant's procedural rights at the hearing. ORS 427.285 requires the attendance of not only the "investigator," but also "other appropriate persons or professionals as necessary." Had the state conducted a diagnostic evaluation, appellant would have been afforded the opportunity to demand that the professionals who conducted the evaluation attend his hearing so that he could cross-examine them on their findings and conclusions. *Cf. State v. Neal*, 150 Or App 432, 436, 946 P3d 367 (1997) (holding that the rule that the

investigator be present and subject to cross examination "is not merely evidentiary. It sets forth a significant procedural safeguard for the [alleged intellectually disabled person], akin to the procedural safeguards set forth in ORS 427.265 with regard to the right of the [alleged intellectually disabled person] to be advised by the court of the nature of the proceedings and the right to counsel.").

Finally, a complete diagnostic report, together with other evidence from the hearing, is a prerequisite to any determination of the ultimate commitment findings under ORS 427.290 by clear and convincing evidence. *See* ORS 427.270(1) (the diagnostic evaluation report shall be forwarded to the court); ORS 427.290 (the court is to make a decision only "[a]fter hearing all of the evidence, and reviewing the findings of the investigation and other examiners"). That report is also an important consideration in the determination of whether any type of care that is less restrictive than commitment was appropriate for appellant. *See* ORS 427.290 ("If in the opinion of the court voluntary treatment and training or conditional release is not in the best interest of the person, the court may order the commitment of the person to the department for care, treatment or training.").

In sum, we conclude that the state conducted an insufficient precommitment investigation because it failed to conduct a proper diagnostic evaluation of appellant. Appellant was issued a citation requiring him to appear at a commitment hearing based on an incomplete investigation. He was subsequently committed based on a deficient record and after a hearing in which he was unable to fully exercise his procedural rights. Thus, without a diagnostic evaluation, appellant was denied the benefit of "significant procedural safeguard[s]" designed to protect him from an unwarranted deprivation of liberty by the commitment process.[7] *Neal*, 150 Or App at 436.

Reversed and remanded.

---

[7] Our disposition obviates the need to address appellant's remaining assignments of error.